**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

In re:

Tea Olive I, LLC d/b/a Stock+Field,

        Debtor.

Case No.: 21-30037
Chapter 11 Case

**NOTICE OF HEARING AND MOTION FOR AN ORDER (I) GRANTING EXPEDITED RELIEF, (II) APPROVING SALE FREE AND CLEAR OF LIENS AND INTERESTS, AND (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES**

TO:    The parties in interest as specified in Local Rule 9013-3(a)(2).

1.    The above-captioned debtor (the "Debtor") moves this Court for the relief requested below and gives notice of hearing.

2.    The Court will hold a hearing on this Motion at 10:00 a.m. (central time) on March 15, 2021, in Courtroom 2B, 232 Warren E. Burger Federal Building and U.S. Courthouse, 316 North Robert Street, St. Paul, MN 55101. **The hearing will be held telephonically:** Dial 1-888-684-8852; when prompted, enter ACCESS CODE: 5988550; when prompted, enter SECURITY CODE: 0428.

3.    Any response to the Debtor's request to approve the assumption and assignment of contracts and leases must be filed and served not later than March 10, 2021, which is five days before the time set for hearing (including Saturdays, Sundays and holidays).  UNLESS A RESPONSE OPPOSING THAT RELIEF IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT A HEARING.

4.    Because the Debtor is requesting that the approval of the sale free and clear be granted on an expedited basis, Local Rule 9006-1(e) provides that written responses to that portion

of the Motion must be filed not later than **two hours prior to the hearing**.   UNLESS A RESPONSE OPPOSING THAT RELIEF IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT A HEARING.

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005, and Local Rules 1070-1 and 1073-1.   This is a core proceeding.   The petition commencing this chapter 11 case was filed on January 10, 2021 (the "<u>Filing Date</u>").   The case is now pending in this Court.

6.      The relief sought in this Motion is based upon 11 U.S.C. §§ 105(a), 363, 365 and 541 and Bankruptcy Rules 2002(a)(2), 6004, and 6006.   The Debtor is currently conducting going out of business sales ("<u>GOB Sales</u>") at all of its retail locations pursuant to a court-approved Consulting Agreement with Tiger Capital Group, LLC and B. Riley Retail Solutions, LLC (collectively, the "<u>Liquidation Consultant</u>").   The Debtor proposes to sell substantially all remaining assets of the Debtor used in its retail operations such as remaining furniture, fixtures, equipment, remaining inventory, and intangibles, but excluding causes of action, and to assume and assign related unexpired leases and executory contracts to R.P. Acquisition Corporation ("<u>Purchaser</u>").

## **BACKGROUND**

7.      On the Filing Date, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").   The Debtor has continued in possession of its respective assets and the management of its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      Further general background information about the Debtor and this case is set forth in the Declaration of Matthew Whebbe in Support of Chapter 11 Petition and Initial Motions [Dkt.

No. 22] and the Declaration of James H. Cullen [Dkt. No. 20].  The additional facts relevant to this Motion set forth below are verified by Matthew Whebbe, as evidenced by the attached verification, and supported by the Supplemental Declaration of James H. Cullen, filed contemporaneously with the Motion.

9.      The Debtor is a Minnesota limited liability company formed in 2018 and headquartered in St. Paul, Minnesota.  It is a farm, home, and outdoor retailer, currently operating 25 stores across Illinois, Indiana, Ohio, Wisconsin, and Michigan.  The Debtor's primary merchandise categories include: pet and animal supplies; sporting goods; farm and agricultural products; lawn, garden, and patio products; apparel; firearms and ammunition; home, toys, and seasonal products; consumables; tools, hardware, and paint; plumbing, electrical, and HVAC; footwear; and automotive products.

10.      The Debtor's predecessor was originally founded in 1964 under the name "Big R Stores" by Bill and Pat Crabtree.  The first store was located in Watseka, Illinois, but eventually stores opened in Illinois, Indiana, Ohio, Wisconsin, and Michigan.  On August 17, 2018, the Debtor purchased the "BigR Stores" business.  After the acquisition in 2018, the Debtor made significant upgrades to the management team, moved the corporate office to Minnesota, improved operations and strategy initiatives, and changed its name from "Big R Stores" to "Stock+Field."

11.      In the beginning of 2020, the Debtor continued its rebranding efforts and expected the business to grow throughout the year.  However, the Covid-19 pandemic unexpectedly changed all expectations for 2020.  All of the Debtor's 25 stores were either closed entirely or, at a minimum, under strict capacity and operating hour restrictions due to the pandemic.  Additionally, the pandemic itself has altered the shopping behaviors of the Debtor's consumers, with some customers not feeling comfortable entering physical stores to shop.

12.     In this challenging environment, the Debtor commenced this case and immediately obtained approval to conduct "store closing" sales on an accelerated basis.

13.     To date, the GOB Sales have outpaced initial projections with respect to timing and percent recovery.  The GOB Sales are currently projected to end on or before March 31, 2021, and in no event are they anticipated to go into April 2021.  As a result, the Debtor's cash collateral budget only anticipates the payment of most operational expenses incurred through the end of March, with significantly decreased employee and occupancy expenses starting in April.  It will become increasingly difficult to retain employees and continuity of operations that are necessary to attract a "going concern" sale.  Any sale of the Debtor's remaining assets must align with this timeframe.  In addition, the Purchaser has indicated that it is necessary to obtain approvals of the proposed transactions as soon as possible, or Purchaser will likely not proceed with the transactions.  The reasons for this are that Purchaser intends to operate Debtor's retail stores and related assets and intends to hire a substantial number or all of Debtor's 900 employees.  Purchaser will need to place orders with its vendors for new merchandise to restock the stores as soon as possible.  Therefore, Purchaser is only interested in this transaction if expedited approvals are obtained.  Therefore, Debtor is seeking expedited relief with respect to the approval of the APA (defined below) to facilitate a sale within this timeframe.

## I.    DEBTOR'S MARKETING EFFORTS.

14.     Prior to the Filing Date, the Debtor engaged Steeplechase Advisors, LLC ("Steeplechase") to provide investment banking and financial advisory services, including the marketing of the Debtor's business and assets.  Upon its retention, Steeplechase immediately began extensive marketing and due diligence efforts on the assets and operations and began to solicit

interest in a sale of all or a portion of the Debtor's business and assets and also solicited replacement senior financing to refinance its obligations to the Prepetition Lenders.

15.    With respect to the going-concern asset sale solicitation process, Steeplechase identified fifty-two (52) financial sponsor targets and seventeen (17) strategic buyer targets. Steeplechase prepared and sent a "teaser" to sixty-two targets.  Twenty-two of those targets executed non-disclosure agreements and received a Confidential Information Memorandum and access to a data room.  Only one target provided a term sheet, which required a substantial equity or subordinated debt infusion from another party to meet working capital needs.  After negotiations and due diligence, and with no interested parties willing to provide subordinated working capital, the parties could not reach agreement on acceptable terms.

16.    In connection with these efforts, Steeplechase also ran a parallel path solicitation process for liquidation bids, structured either as an equity bid or fee-based bid.  Steeplechase sent a teaser to five (5) asset monetization firms, all of which executed non-disclosure agreements and received access to the data room. The Debtor received and evaluated several proposals, including a proposal from the Liquidation Consultant, which it ultimately selected to conduct an orderly liquidation during this case.

17.    Since the Filing Date, the Debtor and Steeplechase have had ongoing negotiations with three parties regarding a potential transaction.  Those parties were given access to due diligence materials and were provided with a template term sheet.  Given the practical requirement that any going concern sale must dovetail with the store closing sales, the Debtor communicated to the interested parties that term sheets were due by February 12, 2021.

18.    The Debtor and Steeplechase had significant and high-level discussions with all three interested parties, but only one party, the Purchaser, submitted a bid.  The other parties have

not responded to further inquiries and Steeplechase has concluded that they are not interested in consummating a transaction.  Steeplechase has concluded that the APA, as described below, provides the best opportunity for the Debtor to obtain value from the assets that will remain after the conclusion of the GOB Sales.  In addition, the assumption and assignment of a substantial number of Debtor's real estate leases will relieve the estate of substantial lease rejection damage claims.  Finally, the sale transaction is beneficial to Debtor's employees, most of whom are expected to be afforded job opportunities with the Purchaser.

## II.    THE ASSET PURCHASE AGREEMENT.

19.    The Debtor's extensive negotiations with the Purchaser have resulted in a term sheet, and the parties are negotiating an Asset Purchase Agreement (the "APA"), which will be filed as soon as possible.  The current version of the APA contemplates that the Purchaser will purchase certain assets (the "Acquired Assets") and may assume certain contracts and leases.  The principal terms are summarized below, which are subject to continued negotiation.  In the case of any inconsistency, the terms of the APA will control over the summary below.

| | |
|---|---|
| Cash Consideration | $1,750,000 |
| Acquired Assets | All assets remaining at the end of the store closing sales, including FF&E at corporate level and store level for acquired locations, remaining inventory, customer lists, and books and records |
| Excluded Assets | Specified assets, including cash and cash equivalents, receivables and rights to payment (including credit card receivables), deposits, refunds, contract rights for contracts not assumed, and causes of action, including any avoidance actions of the bankruptcy estate |
| Contracts and Leases | Assignment of designated contracts and leases, with the Debtor proposing that cure costs are to be paid by Purchaser; contracts and leases to be designated by March 7, 2021 |
| Contingencies | No financing contingency<br>Purchaser may terminate APA by March 7, 2021 if certain modifications to lease terms are not accepted by counterparties |
| Closing | To coincide with the end of the store closing sales, to be no later than March 31, 2021 |

20.     In negotiations, the Purchaser has emphasized its need to obtain Court approval of the transaction as quickly as possible to allow it sufficient time to order new product, communicate with and make offers to existing employees (who may be looking for new employment already), and otherwise arrange an orderly transition of operations at the stores following the conclusion of the GOB Sales.  Given these challenges, and to maintain going concern value, it is imperative that the Debtor be authorized to complete the transaction contemporaneous with the conclusion of the GOB Sales.

21.     There is no question that the proposed transaction is in the best interests of the estate, the Debtor's creditors, landlords and employees. Not only does it monetize substantially all of the Debtor's assets that will remain after the conclusion of the GOB Sales, but it also ensures a viable operation to continue employment for the majority its employees, selling opportunities for the Debtor's vendors, and provide a paying tenant for the Debtor's landlords.

22.     The Purchaser is not an insider or affiliate of the Debtor and has no connections to the Debtor other than that it is negotiations with certain landlords of the Debtor, which are under common ownership with the Debtor, regarding potential modifications to such leases.  The Purchaser has acted in good faith in connection with the sale.

23.     According to the Purchaser's representations in connection with the parties' term sheet, the Purchaser is a family-owned, multi-generation owner and operator of, among other businesses, over 70 retail locations across four states.  The Purchaser has represented that core to its business culture and ethics is its committed focus to providing quality service and products, generating economic vitality, and creating good jobs in small and medium sized communities throughout the Midwest.  The Purchaser has represented that it intends to operate the acquired

locations in a manner that will maintain and create substantial employment and generate significant local tax revenue consistent with its long history of operations in dozens of peer communities. The Purchaser has represented that it has sufficient financial wherewithal to close the transaction as well as invest the significant additional resources necessary to ensure the restart of operations and future success of the acquired locations. The Purchaser has represented that it intends to cause as little disruption as possible to interested parties and has been and will work with vendor partners, landlords, employees, communities, and other impacted parties to ensure a smooth transition and the continuation of retail business activity at each of the acquired locations.

III.    SALE "FREE AND CLEAR".

24.    The sale of the Debtor's assets is proposed to be a sale free and clear of all liens, claims, interests and encumbrances pursuant to 11 U.S.C. § 363(f). The following summarizes the nature, extent and amount of the currently known liens, claims, interests and encumbrances.

25.    As described more fully in the Debtor's Motion for Order (I) Granting Expedited Relief and (II) Authorizing the Use of Cash Collateral on an Interim and Final Basis [Dkt No. 9] (the "Cash Collateral Motion"), the Debtor has outstanding secured debt to the Prepetition Lenders under the Credit Documents, both as defined in the Cash Collateral Motion. The Debtor's Prepetition Credit Obligation is secured by security interests in and liens on substantially all of its personal property, including all of the Acquired Assets. As of February 20, 2021, the outstanding amount of the Debtor's Prepetition Credit Obligation to the Prepetition Lenders totaled approximately $18,298,302. The Debtor projects that at the conclusion of the liquidation sales, the Prepetiton Lenders will be owed about $6 million if all of the assets that are part of the GOB Sales area sold in the manner contemplated by the existing Consulting Agreement. The Debtor believes the transaction with the Purchaser will result in the Prepetition Lenders being owed less

than that amount as a result of the transaction closing, in part because the Debtor forecasts certain contingent budget-related expense savings if the sale to the Purchaser is consummated. The Debtor has requested that the Prepetition Lenders consent to the relief requested; as of this date the Prepetition Lenders have not provided their consent.

26.     Worldwide Distributors filed an original financing statement, file no. 1133295000027, with the Office of the Minnesota Secretary of State asserting (i) a purchase money security interest in all inventory and equipment financed by Worldwide Distributors and sold or distributed to the Debtor, and (ii) a security interest in substantially all assets of the Debtor. Worldwide Distributors' interest in the Debtor's personal property, including the Acquired Asset, is subject to numerous disputes, including the validity and priority of Worldwide Distributors security interest and the amount owed. Further, the Debtor is segregating $3.5 million of proceeds from the sale of its inventory to provide adequate protection to Worldwide Distributors. *See* Final Order Authorizing Use of Cash Collateral [Dkt. No. 144], ¶ 28. The Debtor has requested that Worldwide Distributors consent to the relief requested; as of this date the Worldwide Distributors has not provided its consent.

27.     STIHL Incorporated ("STIHL") filed an original financing statement, file no. 1143474000030, with the Office of the Minnesota Secretary of State asserting a purchase money security interest in all products sold by STIHL to the Debtor.   The amounts owed by the Debtor to STIHL have been satisfied in full.

28.     Blackwood Pet Food, LLC ("Blackwood") filed an original financing statement, file no. 1194888400026, with the Office of the Minnesota Secretary of State asserting a security interest in all inventory purchased by the Debtor from Blackwood. The Debtor has no record of having granted a security interest to Blackwood. Further, the Debtor's accounts payable show no

amount owed to Blackwood.  The Debtor has purchased products from and owes an account payable to Brightpet Nutrition Group, LLC, which, upon information and belief, appears to be an affiliated, but legally separate entity.  As a result, the Debtor disputes that Blackwood has an interest in any of the Acquired Assets.

29.     Crown Equipment Corporation filed an original financing statement, file no. 1087376300603, with the Office of the Minnesota Secretary of State asserting a security interest in all equipment leased by Crown Equipment Corporation to the Debtor.  The equipment leased by Crown Equipment Corporation to the Debtor is not included in the proposed sale.  Instead, those leases are currently identified as unexpired leases that may be designated for assumption and assignment.

30.     Wells Fargo Bank, N.A. filed an original financing statement, file no. 1165744200602, with the Office of the Minnesota Secretary of State asserting a security interest in a forklift owned by the Debtor, model no. C5 S/N 9A215602.  The forklift in which Wells Fargo Bank, N.A. asserts a security interest is not included in the proposed sale.

31.     The Debtor requests that the order approving the sale of the Acquired Assets provide that such sale is free and clear of all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

32.     In addition, the Debtor requests that an order approving the sale to the Purchaser include the protections provided in section 363(m) and 363(n) of the Bankruptcy Code.  The Purchaser does not have an interest clearly adverse to the Debtor, its estate, or its creditors.  The Purchaser is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Further, the APA is a product of arm's-length, good-faith negotiations, and

thus the granting of the requested sections 363(m) and 363(n) protections is appropriate under the circumstances.

## IV.   ASSUMPTION AND ASSIGNMENT.

33.    In connection with the proposed sale, the Debtor proposes to assume and assign certain executory contracts and unexpired leases to be identified on a schedule to the APA.  The Purchaser has until March 7, 2021 to complete and/or modify such schedule.

34.    Attached as **Exhibit 1** is a list that (i) identifies the executory contracts or unexpired leases (the "Proposed Assumed Contracts") that may be assumed and (ii) lists the Debtor's good faith calculation of the cure costs associated with each contract or lease (the "Cure Costs").

## V.   APPROVAL OF TRANSITION SERVICES AGREEMENT.

35.    The proposed transaction contemplates a transition services agreement whereby the Debtor will retain access to employees and records necessary to wind down the estate and the Debtor will provide to the Purchaser the ability to operate under licenses held by the Debtor on terms that are to be negotiated before the Sale Approval Hearing.

## VI.   SALE OF CUSTOMER LIST AND AGPLUS LIST.

36.    The Debtor permits its customers to sign up for the Debtor's e-mail list and also allows its customers to create online accounts.  The Debtor maintains a list of these customers and their e-mail addresses (the "Customer List"), which the Debtor uses to send promotions, special giveaways, contests, and other content relating to the Debtor's products.

37.    As more fully described in the Notice of Hearing and Motion for Entry of an Order (I) Granting Expedited Relief and (II) Authorizing the Debtor to Honor and Continue Certain Customer Programs and Customer Obligations in the Ordinary Course of Business [Docket No. 12], the Debtor also operates a rebate program called AgPlus.  The Debtor maintains a list of its

AgPlus members and their contact information for the purpose of providing the rebates each year (the "AgPlus List").

38.      The Customer List and the AgPlus List are included in the Acquired Assets.  As the Customer List and AgPlus List may be considered "personally identifiable information" of the Debtor under section 101(41A), the Debtor seeks approval of the sale under section 363(b)(1)(B) of the Bankruptcy Code.

39.      The Debtor filed a Motion for Order (I) Granting Expedited Relief and (II) Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman Immediately Pursuant to Section 322(A) of the Bankruptcy Code [Dkt. No. 170], seeking the appointment of a consumer privacy ombudsman (an "Ombudsman") under section 322(a) of the Bankruptcy Code (the "Ombudsman Motion").

40.      Assuming that the Court appoints an Ombudsman, the Debtor requests approval of the sale of the Customer List and the AgPlus List under section 363(b)(1)(B) of the Bankruptcy Code.

## VII.    NOTICE.

41.      The Debtor is providing notice of the sale by sending the Sale Notice by first-class mail to all parties in interest.

42.      The Debtor is also posting the Sale Notice on the website of the Debtor's noticing agent, Donlin Recano (the "Case Information Website").

## VIII.    REQUEST FOR EXPEDITED RELIEF.

43.      The Debtor requests expedited relief to allow the Debtor to accomplish the sale within the practical constraints of this case.  As described above, the Purchaser needs as much lead time as possible to retain employees, order new inventory and maintain continuity.

## IX.    REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(h) AND 6006(d).

44.    Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtor requests that any order approving the relief requested herein be effective immediately, by providing that the 14-day stay is inapplicable.  There is no just reason for delaying the effectiveness of the order.

45.    Pursuant to Local Rule 9013-2(c), the Debtor gives notice that it may, if necessary, call one or more of the following to testify regarding the facts set forth in this Motion: a) Matthew Whebbe, the Chief Executive Officer of the Debtor, whose business address is 2600 Eagan Woods Drive, Suite 120, Eagan, MN 55121, (b) Michael Wesley, a Partner at Clear Thinking Group, the Chief Restructuring Officer and Financial Advisor to the Debtor, whose business address is 401 Towne Centre Drive, Hillsborough, NJ 08844, and (c) James H. Cullen, the managing partner of Steeplechase Advisors, LLC, whose business address is 601 Carlson Parkway, Suite 1050, Minnetonka, MN 55305.

WHEREFORE, the Debtor respectfully requests that the Court enter a Sale Approval Order, substantially in the form of the attached proposed order:

A.  Granting expedited relief;

B.  Authorizing the Debtor to sell the Acquired Assets free and clear of all liens, claims, interests, and encumbrances, which will attach to the proceeds of sale;

C.  Authorizing the Debtor to assume and assign in connection with above-described sale the Proposed Assumed Contracts, free and clear of all liens, claims, interests, and encumbrances, which will attach to the proceeds of sale; and

D.  Granting such other and further relief as the Court may deem just and equitable.

Dated:  February 26, 2021

*/e/ Clinton E. Cutler*
_____

Clinton E. Cutler (#0158094)
Steven R. Kinsella (#0392289)
James C. Brand (#387362)
Samuel M. Andre (#0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
612.492.7000
ccutler@fredlaw.com
skinsella@fredlaw.com
jbrand@fredlaw.com
sandre@fredlaw.com

**ATTORNEYS FOR DEBTOR**

## <u>VERIFICATION</u>

I, Matthew Whebbe, the CEO of the Debtor, declare under penalty of perjury that the facts set forth in the preceding motion are true and correct according to the best of my knowledge, information, and belief.

Dated: February 26, 2021

_____
Matthew Whebbe

**EXHIBIT 1**

The inclusion of any lease, contract, or other agreement on this list does not constitute an admission that a particular lease, contract, or other agreement is an executory contract or unexpired lease within the meaning of 11 U.S.C. § 365, or require or guarantee that such lease, contract, or other agreement will be assumed and assigned, and all rights of the Debtor with respect thereto are reserved. The Debtor has generally not included amendments, statements of work, revisions, addendums, or other ancillary documents in the list below, as the Debtor views such ancillary documents as a part of and encompassed by the main lease, contract, or other agreements listed.

| COUNTERPARTY | ADDRESS | TITLE OR DESCRIPTION OF CONTRACT / LEASE / AGREEMENT | CURE AMOUNT |
|---|---|---|---|
| Clocktower Plaza, LLC | 970 Windham Court Suite 7 Boardman, OH 44513 | Lima Store Lease | $29,948.75 |
| Crown Credit Company | P.O. Box 640352 Cincinnati, OH 45264 | Lease: Make: ENER, Model: 12-85G-7, Type: Battery, Serial #: MPA1227340 | $68,466.97 (note, debtor is in process of allocating this combined cure amount to applicable leases) |
| | | Lease: Make: ENER, Model: 12-E140-15, Type: Battery, Serial #: RNC848645 | |
| | | Lease: Make: ENER, Model: 18-125P-13, Type: Battery, Serial #: MNF1205664 | |
| | | Lease: Make: DEKA, Model: 18-D125-13, Type: Battery, Serial #: 6043GE | |
| | | Lease: Make: DEKA, Model: 18-D125-13, Type: Battery, Serial #: 3863CG | |
| | | Lease: Make: DEKA, Model: 18-D85-17, Type: Battery, Serial #: 5503DE | |
| | | Lease: Make: DEKA, Model: 18-H120-13, Type: Battery, Serial #: 0331DC | |
| | | Lease: Make: DEKA, Model: 18-H120-13, Type: Battery, Serial #: 0344DC | |
| | | Lease: Make: DEKA, Model: 18-P140-15, Type: Battery, Serial #: 0387AD | |
| | | Lease: Make: AES, Model: 18Y-865X3, Type: Charger, Serial #: 07L42143 | |
| | | Lease: Make: AMTK, Model: 750H3-18C, Type: Charger, Serial #: 406CS45504 | |
| | | Lease: Make: GNB, Model: FLX20018750T1H, Type: Charger, Serial #: 10F3368M | |
| | | Lease: Make: CRW, Model: FS3-MP324-2, Type: Charger, Serial #: 3E734027 | |
| | | Lease: Make: CRW, Model: FS3-MP344-1, Type: Charger, Serial #: 3M19090491 | |
| | | Lease: Make: ACT, Model: P36750R25SB, Type: Charger, Serial #: 37120046IB | |
| | | Lease: Make: GNB, Model: SCR20012965T1H, Type: Charger, Serial #: 07J8158M | |
| | | Lease: Make: CRW, Model: SC5225-30, Type: Sit Down Forklift - Electric, Serial #: 9A189296 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10041960 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10045103 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10069117 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10054470 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10044879 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10053221 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10034568 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10059685 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10034564 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 9A232494 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 9A217224 | |
| | | Lease: Make: CRW, Model: C51000-50, Type: Sit Down Forklift - LP unit, Serial #: 10028699 | |
| | | Lease: Make: CRW, Model: C51000-60, Type: Sit Down Forklift - LP unit, Serial #: 9A193839 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 10023140 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 9A230745 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 10147217 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 9A226873 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 9A207939 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 9A203960 | |

| COUNTERPARTY | ADDRESS | TITLE OR DESCRIPTION OF CONTRACT / LEASE / AGREEMENT | CURE AMOUNT |
|---|---|---|---|
| (Continued)<br><br>Crown Credit Company | P.O. Box 640352<br>Cincinnati, OH 45264 | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 10147224 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 10021052 | |
| | | Lease: Make: CRW, Model: C51050-50, Type: Sit Down Forklift - LP unit, Serial #: 10023710 | |
| | | Lease: Make: CRW, Model: RM6025-45, Type: Stand-up Reach truck, Serial #: 1A421554 | |
| | | Lease: Make: CRW, Model: RR5715-35, Type: Stand-up Reach truck, Serial #: 1A375578 | |
| | | Lease: Make: CRW, Model: RR5725-35, Type: Stand-up Reach truck, Serial #: 1A448399 | |
| | | Lease: Make: CRW, Model: RR5725-45, Type: Stand-up Reach truck, Serial #: 1A372937 | |
| | | Lease: Make: CRW, Model: RR5725-45, Type: Stand-up Reach truck, Serial #: 1A376854 | |
| | | Lease: Make: CRW, Model: RR5725-45, Type: Stand-up Reach truck, Serial #: 1A399996 | |
| | | Lease: Make: CRW, Model: RR5725-45, Type: Stand-up Reach truck, Serial #: 1A428572 | |
| | | Lease: Make: CRW, Model: RR5725-45, Type: Stand-up Reach truck, Serial #: 1A353398 | |
| | | Lease: Make: CRW, Model: SX3000-30, Type: Walkie stacker, Serial #: 5A551256 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10041966 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10035016 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10034569 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10151796 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10034560 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10035013 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10035012 | |
| | | Lease: Make: CRW, Model: WAV60-118, Type: Work Assist Vehicle (WAVE), Serial #: 10147227 | |
| Findlay Mall Capital Holding | 1010 Northern Blvd, Suite 212<br>Great Neck, NY 11021 | Findlay Store Lease | $30,472.58 |
| First National Bank of Omaha | 1620 Dodge Street<br>Omaha, NE 68197 | Contract - Joint Marketing Agreement of Co-Branded Credit Card | $0.00 |
| Fleet Equipment | 555 E. South Frontage Rd<br>Bolingbrook, IL 60440 | Fleet Equipment Trailer Leases | $73,975.00 |
| Fox River Plaza, LLC | 138 Buntrock Ave<br>Thiensville, WI 53092 | Burlington Store Lease | $20,000.00 |
| Getty Images | Western Union Telegraph Building<br>195 Broadway<br>New York, NY 10007 | Getty Images Marketing | $0.00 |
| Guardian Life | P.O. Box 677458<br>Dallas, TX 75267 | Benefits Contract | $9,923.15 |
| Health Care Service Corporation | 25551 Network Place<br>Chicago, IL 60673 | Benefits Contract | $370,746.84 |
| Home Depot USA, Inc | 400 White Clay Center Dr.<br>Lock Box 7491<br>Neward, DE 19711 | Marion Store Lease | $15,812.50 |
| HSA Bank | P.O. Box 939<br>Sheboygan, WI 53082 | Benefits Contract | $532.25 |
| Illiana Realty, LLC | P.O. Box 158<br>Watseka, IL 60970 | Distribution Center -53 Store Lease<br>McHenry Store Lease | $2,000.00 |
| Joda Crabtree | P.O. Box 461<br>Watseka, IL 60970 | Distribution Center -51 Store Lease | $4,000.00 |
| Juniper I, LLC | 2600 Eagan Woods Dr<br>Eagan, MN 55121 | Portage Store Lease | $274,207.35 |
| Juniper II, LLC | 2600 Eagan Woods Dr<br>Eagan, MN 55121 | Lansing Store Lease | $490,090.75 |
| Lincoln Financial Group | P.O. Box 0821<br>Carol Stream, Il 60132 | Benefits Contract | $8,888.51 |
| Mastercard International Incorporated | Attn: Craig Vosburg, President, North Am<br>20000 Purchase Street<br>Purchase, NY 10577 | Contract - Co-Branded Credit Card Provider | $0.00 |

| COUNTERPARTY | ADDRESS | TITLE OR DESCRIPTION OF CONTRACT / LEASE / AGREEMENT | CURE AMOUNT |
|---|---|---|---|
| Northpoint Development Holdings LLC | Keith Weinstein<br>20 North Point Drive<br>Streator, Il 61364 | Streator Store Lease | $14,089.00 |
| Oracle+Netsuite | Bank of America Lockbox Serv<br>500 Oracel Parkway<br>Redwood Shores, CA 94065 | Bronto Email Services | $0.00 |
| People's ETC | 275 E. Court Street, Suite 201<br>Kankakee, IL 60901 | Contract - Payroll service provider | $0.00 |
| Pink Dogwood | 2600 Eagan Woods Dr<br>Eagan, MN 55121 | Distribution Center -52 Store Lease | $0.00 |
| Salesforce.com Inc | 415 Mission Street<br>San Francisco, CA 94105 | Website Service Contract | $55,560.00 |
| Seritage SRC Finance LLC | P.O. Box 776148<br>Chicago, Il 60677 | North Elkhart Store Lease | $28,292.18 |
| Store Capital | 8377 E. Hartford Dr.<br>Scottsdale, AZ 85255 | Store Capital Master Lease #1<br>Store Capital Master Lease #2<br>Store Capital Master Lease #3 | $1,102,517.00 |
| VPS Service Plan | P.O. Box 742135<br>Los Angeles, CA 90074 | Benefits Contract | $7,963.53 |

72262492.1

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Tea Olive I, LLC d/b/a Stock+Field,

         Debtor.

Case No.: 21-30037
Chapter 11 Case

## MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER (I) GRANTING EXPEDITED RELIEF, (II) APPROVING SALE FREE AND CLEAR AND (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES

Tea Olive I, LLC d/b/a Stock+Field, (the "Debtor") submits this memorandum of law in support of the motion submitted herewith (the "Motion") in accordance with Local Rule 9013-2(a).

## BACKGROUND

The supporting facts are set forth in the verified Motion, the Declaration of Matthew Whebbe in Support of Chapter 11 Petition and Initial Motions [Dkt. No. 22], the Declaration of James H. Cullen [Dkt. No. 20] and the Supplemental Declaration of James H. Cullen filed contemporaneously with the Motion. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

## ANALYSIS

### I.     A SALE IS IN THE BEST INTEREST OF THE ESTATE AND ITS CREDITORS

#### A.     The APA Is Supported By Sound Business Justifications.

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business. 11 U.S.C. § 363(b)(1). In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally

should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003). The court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property. *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in *In re Lionel*. Those factors are:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel*, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *Equity Funding Corp. of America v. Financial Associates (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991)

(setting forth four elements of a "sound business purpose" test: (1) a sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of the plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in *Lionel* observed that:

> A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the code.  As Justice Holmes once said in a different context, 'Some play must be allowed for the joints of the machine . . .'.

*Lionel*, 722 F.2d at 1069 (quoting *Missouri, Kansas and Texas Ry. Company v. May*, 194 U.S. 267 (1904)); *see also Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets . . . .").

The proposed sale should be approved based on the factors set forth above.  The Debtor has determined, after careful evaluation of its business prospects, that the proposed APA is in the best interests of the estate.  Generally, "the best way to determine the market value of property is to expose the property to the marketplace."  *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing *Bank of America NT & SA v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S. Ct. 1411, 1423 (1999)).  The Debtor has extensively marketed its assets and has found no higher or better offer.

The Debtor has given reasonable notice under the circumstances. In negotiations, the Purchaser emphasized its need to obtain Court approval of the transaction as quickly as possible to allow it sufficient time to order new product, communicate with and make offers to existing employees (who are out looking for new employment already), and otherwise arrange an orderly transition of operations at the stores.  It is imperative that the Debtor complete the transaction

3

contemporaneous with the conclusion of the GOB Sales in order to maintain going concern value and to avoid the accumulation of additional administrative expenses.

The proposed transactions with the Purchaser provides the best opportunity for the Debtor to monetize the assets that will remain after the conclusion of the GOB Sales, and may provide the opportunity for continued employment for many of its employees, additional sale opportunities for vendors, and go-forward tenant for many of its landlords.  The gross cash purchase price is a reasonable and adequate price for the Acquired Assets.

Finally, this sale is proposed in good faith.  The Acquired Assets have been extensively marketed, the Purchaser is not an insider, and the APA was negotiated at arms' length.  All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties.  The proposed sale is supported by sound business justifications and should be approved.

**B.**     <u>**The Court Should Authorize The Debtor To Assume And Assign Certain Unexpired Executory Contracts And Unexpired Leases To The Purchaser.**</u>

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

> The trustee may assign any executory contract or unexpired lease of the debtor only if –
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided . . . .

11 U.S.C. § 365(f)(2).

In considering whether to approve a proposed assumption and assignment of an executory contract or unexpired lease, the court uses a business judgment test. "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval." *Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (quoting *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303 (5th Cir. 1985)). Assumption and assignment of identified contracts and leases is an integral part of the APA. Having certain executory contracts and unexpired leases available is key to obtaining the highest and best price for the assets. In addition, pursuant to Bankruptcy Code section 365(k), the estate will have no liability under the assumed and assigned contracts following the assignment to the purchaser. The Debtor requests that the Court approve the assumption and assignment of the executory contracts and unexpired leases that will be assumed as part of the sale.

Whether there exists "adequate assurance of future performance" as required under Bankruptcy Code section 365(b)(1)(C) involves a factual inquiry, requiring case-by-case consideration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event any counterparties challenge the Purchaser's ability to provide adequate assurance of future performance, the Purchaser will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform executory contracts or unexpired leases to be assumed.

## II.    THE DEBTOR CAN SELL THE ASSETS FREE AND CLEAR OF LIENS.

The Debtor seeks to sell the Acquired Assets free and clear of all liens, claims and interests of all claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

(iv)    such interest is in bona fide dispute; or

(v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Any one of the five conditions, including the consent of the lienholders, provides authority to sell free and clear of liens. *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Motion, such party should be deemed to have consented to the sale. *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

The Debtor will satisfy section 363(f) by obtaining the consent of secured parties to the sale of such assets free and clear of all liens, claims and encumbrances, or establishing that any remaining interests are the subject of a bona fide dispute (such as Worldwide Distributors and Blackwood).[1] If such consent is not obtained, the Debtor requests that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtor, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto. The Debtor requests that the Sale Approval Order provide for the assets to be sold free and clear of all liens, claims and interests.

---

[1] As noted in the Motion, the Debtor has requested, but not yet obtained, the consent of the Prepetition Lenders to the proposed transaction with the Purchaser.

## III.    THE PROPOSED SALE IS IN GOOD FAITH.

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). The purpose of such a finding is to facilitate a safe-harbor determination under section 363(m), which protects purchasers of a debtor's property when the purchase is made in "good faith." 11 U.S.C. § 363(m).

Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). This provision serves the important purposes of encouraging good faith transactions and of preserving the finality of the bankruptcy court's order unless stayed pending appeal. *Abbotts Dairies*, 788 F.2d at 147.

The Purchaser does not have an interest clearly adverse to the Debtor, its estate, or its creditors. The APA is a product of arm's-length, good-faith negotiations. The Debtor requests that the Sale Approval Order provide the protections of section 363(m) by explicitly finding that the Purchaser acted in good faith.

## IV.    THE SALE OF THE CUSTOMER LIST AND AGPLUS LIST IS AUTHORIZED BY THE BANKRUPTCY CODE.

Under section 363(b)(1) of the Bankruptcy Code, the Debtor may

> use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" to include:

(i) the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

(ii) the geographical address of a physical place of residence of such individual;

(iii) an electronic address (including an e-mail address) of such individual;

(iv) a telephone number dedicated to contacting such individual at such physical place of residence;

(v) a social security account number issued to such individual; or

(vi) the account number of a credit card issued to such individual.

11 U.S.C. § 101(41A).

The Debtor seeks to sell the Customer List and the AgPlus List, which include customers names, electronic addresses, and, for the AgPlus List, the geographic address of the AgPlus members.   Consequently, the Customer List and the AgPlus List likely constitute "personally identifiable information" under the Bankruptcy Code.  As described more fully in the Ombudsman Motion, the Debtor's privacy policy appears to restrict the sale of the Customer List and the AgPlus List.

8

In order to comply with section 363(b)(1) the Debtor filed the Ombudsman Motion and believes the Court will appoint an Ombudsman. The Debtor will work with the Ombudsman, once appointed by the Court, to provide the Court with sufficient facts, circumstances, and conditions of the sale to allow the Court to approve the sale under section 363(b)(1)(B)(i) of the Bankruptcy Code. The Debtor is unaware of any applicable nonbankruptcy law that would otherwise prohibit the sale of the Customer List and the AgPlus List under section 363(b)(1)(B)(ii) of the Bankruptcy Code.

The Debtor requests that the Court approve the sale of the Customer List and the AgPlus List under 11 U.S.C. § 363(b)(1).

## CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the court grant the relief requested in the Motion.

Dated:  February 26, 2021

*/e/ Clinton E. Cutler*
Clinton E. Cutler (#0158094)
Steven R. Kinsella (#0392289)
James C. Brand (#387362)
Samuel M. Andre (#0399669)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
612.492.7000
ccutler@fredlaw.com
skinsella@fredlaw.com
jbrand@fredlaw.com
sandre@fredlaw.com
**ATTORNEYS FOR DEBTOR**

72255525 v3

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MINNESOTA

In re:

Tea Olive I, LLC d/b/a Stock+Field,

          Debtor.

Case No.: 21-30037
Chapter 11 Case

## ORDER (I) GRANTING EXPEDITED RELIEF, (II) APPROVING SALE FREE AND CLEAR, AND (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

This case came before the court on the Debtor's Motion for an Order (I) Granting Expedited Relief, (II) Approving Sale Free and Clear, and (III) Approving the Assumption and Assignment of Certain Contracts and Leases ("Sale Motion").[1]

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

### IT IS FOUND AND DETERMINED THAT:[2]

A.     This court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.     Venue of this case (the "Chapter 11 Case") in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Bankruptcy Rule 7052.

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014.

D.     This order (the "Sale Approval Order") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

E.     Cause exists to grant expedited relief.

F.     On February 26, 2021, the Debtor served the Sale Notice [Dkt No. __] as demonstrated by the certificate of service filed as Dkt. No. __ thereby providing due and proper notice of the Sale Motion.  No other or further notice of the Sale is required.

G.     On February 26, 2021, the Debtor served the Assumption and Assignment Notice [Dkt. No. __] as demonstrated by the certificate of service filed as Dkt. No. __ thereby providing due and proper notice of the intended assumption and assignment executory contracts or unexpired leases and any Cure Amounts.  Adequate notice and opportunity to be heard was provided to parties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order, including to the Cure Amount.  No other or further notice of the assumption and assignment of the Assumed Contracts is required.

H.     Based upon the foregoing and the certificates of service filed with the court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Approval Hearing, the

sale (the "Sale") of the Acquired Assets to R.P. Acquisition Corporation (the "Purchaser") pursuant to that certain Asset Purchase Agreement dated February __, 2021 (the "APA"), and the proposed assumption and assignment of the Assumed Contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3.

I.      The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of this Chapter 11 Case. The Debtor has demonstrated compelling circumstances, good, sufficient and sound business purposes for the Sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code.  The Sale of the Acquired Assets pursuant to the APA constitutes a reasonable and sound exercise of the Debtor's business judgment.

J.      Upon entry of this Sale Approval Order, the Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtor has been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.

K.      The Debtor is authorized to sell and transfer the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests (as that term is defined in paragraph 8 hereof) pursuant to the APA because it has satisfied the requirements of section 363(f) of the Bankruptcy Code.

L.      Those holders of Liens, Claims, Encumbrances and Interests against the Debtor, its estate or in respect of any of the Acquired Assets who did not object, or who withdrew their

objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.

M.      Except for the Assumed Liabilities, the transfer of the Acquired Assets to the Purchaser, and assumption and assignment to the Purchaser of the Assumed Contracts, will not subject the Purchaser to any Lien, Claim, Encumbrance and Interest whatsoever with respect to the operation of the Debtor's business prior to the Closing Date to the maximum extent provided by section 363(f) of the Bankruptcy Code.

N.      The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion within the meaning of section 363(m) of the Bankruptcy Code.  As a result of the foregoing, Debtor and Purchaser are entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all aspects of the APA.  Purchaser is not an "insider" of Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.  Moreover, none of Purchaser, Debtor, or any other party has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

O.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts, as described on Schedule 2.1(c) to the APA, including any amendments or modifications to such Schedule as agreed to by the Debtor and Purchaser pursuant to the APA, in connection with the consummation of the Sale of Acquired Assets, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtor, its estate, its creditors and its equity holders.  Upon the Closing, Purchaser shall be deemed to have assumed only the Assumed Liabilities.  Except with respect to the Assumed Liabilities, the Closing and the consummation of the transactions contemplated by the APA shall

not, by reason of such Closing and transactions, subject Purchaser to any liability whatsoever for claims against Debtor with respect to the operation of the business of Debtor before the Closing Date.

P.     All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Contracts pursuant to the APA are as follows: the Cure Amounts, if any, set forth in the Assumption and Assignment Notice and due or owing under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code shall be paid by the Purchaser, subject to the terms and conditions of the APA.  Counterparties to the Assumed Contracts have received adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.  Accordingly, the Debtor has satisfied the requirements of sections 365(b)(1) and section 365(f)(2) of the Bankruptcy Code with respect to the Assumed Contracts identified in the APA.

Q.     In the absence of a stay pending appeal, Purchaser will be acting in good faith pursuant to Bankruptcy Code § 363(m) in closing the transactions contemplated by the APA at any time on or after the entry of this Order.  The Court being satisfied that (i) no objections have been raised of a nature that should prevent the immediate entry of this Order, (ii) the APA contains deadlines with which the parties must comply, and (iii) the transfer of the Acquired Assets without delay beyond a time selected by the parties will help preserve the value of the Acquired Assets for Purchaser and Debtor's estate, the Court finds cause to lift the stays provided in Bankruptcy Rules 6004(h) and 6006(d).

**IT IS ORDERED:**

## General Provisions

1.     The request for expedited relief is granted.

2.      The Sale Motion is granted to the extent set forth herein.

3.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled.

4.      Notice of the Sale Approval Hearing was fair and equitable under the circumstances and complied in all respects with sections 102(1), 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 2002-4, 6004-1, 9013-2 and 9013-3.

### Approval of the APA

5.      The APA and all ancillary documents are approved.

6.      The Sale of the Acquired Assets to Purchaser pursuant to the APA is authorized under sections 363 and 365 of the Bankruptcy Code and the entry of the Debtor into the APA is approved.

7.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized to execute and to fully perform under the APA, together with all additional instruments and documents that may be reasonably necessary, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of transferring any or all of the Acquired Assets and perform the obligations of the Debtor under the APA, including effectuating amendments to the APA.

### Transfer of the Acquired Assets

8.      Except to the extent set forth in the APA, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Acquired Assets shall be transferred to the Purchaser in accordance with the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of

such Acquired Assets and shall vest Purchaser with title to the Acquired Assets, free and clear of all Liens (as defined in the section 101(37) of the Bankruptcy Code), Claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, and other interests to the maximum extent of section 363(f) of the Bankruptcy Code (the foregoing collectively referred to as "Liens, Claims, Encumbrances and Interests" herein, *provided, however*, that throughout this Sale Approval Order the term "Liens, Claims, Encumbrances and Interests" shall not include Assumed Liabilities, except as otherwise set forth in the APA).    All Liens, Claims, Encumbrances and Interests that are released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds to the extent applicable with the same validity, force and effect which they now have as against the Debtor, its estate or the Acquired Assets.  The sole and exclusive right and remedy available to purported creditors, equity holders, including, without limitation, equity holders of the Debtor, holders of any other Liens, Claims, Encumbrances and Interests, and parties in interest shall be a right to assert Liens, Claims, Encumbrances and Interests against the Debtor's estate.

9.    All persons and entities are permanently barred from commencing or continuing any action or other proceeding of any kind against the Acquired Assets or the Purchaser and its successors or assigns with respect to any Liens, Claims, Encumbrances and Interests arising prior to the Closing Date.  The sole and exclusive right and remedy available to any Person who asserts any Liens, Claims, Encumbrances and Interests in any way related to the Acquired Assets arising prior to the date of Closing shall be a right to assert such Liens, Claims, Encumbrances and Interests against the Debtor's estate.  If the proposed Sale fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Acquired Assets unaffected

by this Sale Approval Order.  As of the Closing, the Purchaser shall have any and all rights, claims, defenses and offsets held by Debtor and the estate with respect to Assumed Liabilities.

10.     Except for the Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Purchaser to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Purchaser of Assumed Contracts**

11.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtor's assumption and assignment to the Purchaser of the Assumed Contracts is approved.

12.     The Debtor is authorized to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

13.     In the event that an Assumed Contract is added to the APA after the date of this Sale Approval Order, non-debtor parties shall be given fourteen (14) days' notice of the proposed assumption and assignment and any Cure Amounts and a right to object thereto.

**Approval of Transition Services Agreement**

14.     The Debtor's entry into and performance under the Transition Services Agreement is approved pursuant to 11 U.S.C. § 363 as a sound exercise of the Debtor's business judgment.

8

**Additional Provisions**

15.     The transaction contemplated by the APA is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the Purchaser is a purchaser in good faith of the Acquired Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

16.     The consideration provided by the Purchaser for the Acquired Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and under the other laws of the United States, any state, territory, possession or the District of Columbia and (ii) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.  All entities presently or on the Closing Date that may be in possession of some or all of the Acquired Assets are directed to surrender possession of the Acquired Assets to Purchaser on or before the Closing Date.

17.     Except as otherwise specifically provided for in this Sale Approval Order and in the APA, the Purchaser and its employees, officers, directors, advisors, affiliates, owners, successors and assigns shall have no liability or responsibility for any liability or other obligation of the Debtor or the estate arising under or related to the Acquired Assets or other assets, operations, activities, or businesses of Debtor, including but not limited to under any theory of successor or vicarious liability, antitrust, environmental or labor law, *de facto* merger or substantial continuity.

18.     The transfer of all consumer personally identifiable information, as such term is defined in section 101 of the Bankruptcy Code ("PII"), from the Debtor to the Purchaser, is

hereby approved; provided, however, that the Purchaser shall (a) use the PII for the same purpose(s) as it was used by the Debtor, namely, to sell products and services and provide special offers and rewards for the Debtor's customers; (b) comply with the Debtor's privacy policy (as may be amended in accordance with applicable law after the Closing); (c) before making any "material change" to the Debtor's privacy policy or using or disclosing any PII in a different manner from that specific in such policy, notify consumers and afford them an opportunity to opt-out of the changes to those policies or the new uses of their personal information; (d) notify the Debtor's customers whose PII the Purchaser is acquiring of the change in ownership and advise them that the Purchaser will abide by the Debtor's privacy policy (as may be amended after the Closing in accordance with applicable law); (e) employ appropriate information security controls (technical, operational, and managerial) to protect the PII, including strong encryption; and (f) abide by all applicable federal, state, and international laws, including laws prohibiting unfair or deceptive practices "UDAP," data breach notification, data disposal, privacy and confidentiality of personal information, "do-not-track," "do-not-call," and "no spam" laws.

19.    This Court retains exclusive jurisdiction to (i) interpret, enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (ii) compel delivery of the Acquired Assets to the Purchaser, (iii) resolve any disputes arising under or related to the APA and related agreements, except as otherwise provided therein, (iv) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Purchaser or in respect of the Acquired Assets, and (v) interpret, implement and enforce the provisions of this Sale Approval Order.

20.     As of the Closing, all agreements and all orders of this court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

21.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the court, provided that any such modification, amendment or supplement is not materially less favorable to the Debtor.  In the event a modification is materially less favorable to the Debtor, the Debtor shall file and serve a notice of such modification.  If no party-in-interest filed a written objection with the court within five (5) business days, such modification shall be deemed approved without further order of the court, but the court may enter any such further order as may be necessary.

22.     Notwithstanding Fed. R. Bankr. P. 6004(h) and 6006(d), this Sale Approval Order shall take effect immediately upon entry, and in the absence of any entity obtaining a stay pending appeal, Debtor and Purchaser are free to close under the APA at any time.

23.     To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Case, the terms of this Sale Approval Order shall govern.

Dated:                                          _____
                                                William J. Fisher
                                                United States Bankruptcy Judge


72258576 v1

11